UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CYNTHIA J. KOEPP, JOHN D. PLACE, TODD
ZWIGARD AND PADDINGTON M. ZWIGARD,

                              Plaintiffs,                    08-CV-01369

vs.

                                                            (NAM/ATB)

SUSANNE HOLLAND,

                              Defendant.
_____

**APPEARANCES:**                           **OF COUNSEL:**

MICHAELS & SMOLAK, P.C.                     Michael G. Bersani, Esq.
71 South Street
Auburn, New York 13021-3916
*Attorneys for Plaintiffs*

SCOLARO, SHULMAN, COHEN, FETTER            David C. Temes, Esq.
& BURSTEIN, P.C.
507 Plum Street, Suite 300
Syracuse, New York 13204
*Attorneys for Defendant*

**Hon. Norman A. Mordue, Chief U.S. District Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION AND PROCEDURAL BACKGROUND**

        On December 2, 2008, plaintiffs Cynthia J. Koepp ("Koepp" or "plaintiff"), John D. Place

("Place" or "plaintiff"), Todd Zwigard ("T. Zwigard" or "plaintiff") and Paddington M. Zwigard

("P. Zwigard"or "plaintiff") commenced this action pursuant to Article 15 of the Real Property

Actions and Proceedings Law ("RPAPL") in New York State Supreme Court, County of Cayuga.

On December 24, 2008, defendant removed the action to this Court based on diversity jurisdiction

pursuant to 28 U.S.C. § 1332.

        Plaintiffs seek a determination of a claim to real property.  According to the complaint,

"the action concerns a strip of land 40 feet wide running very near the shores of Cayuga Lake formerly used as a railroad bed by the Cayuga Lake Railroad and then by successor railroad companies, including the Lehigh Valley Railroad Company".[1]  The former railroad property was subsequently conveyed to defendant and plaintiffs claim ownership to "parcels of land through which said 40-foot former railroad land runs".[2]  Plaintiffs also claim that pursuant to their deeds, they have easements over the 40-foot strip to access the western portion of their properties.  In the alternative, plaintiffs seek to obtain and quiet title to said easements through adverse possession, necessity or prescription.

Prior to removal, plaintiffs filed an Order to Show Cause seeking a preliminary injunction enjoining and restraining defendant from building a permanent fence pending the termination of the action.  On December 2, 2008, the Honorable Thomas G. Leone issued an ex parte order with a temporary restraining order.  The Order provided, *inter alia*:

> ORDERED, that pending the hearing of this Order to Show Cause for a preliminary injunction, plaintiffs are granted a temporary restraining order that the defendants herein be and hereby are enjoined and restrained from installing any additional fencing (not presently installed) that interferes with the use of the alleged easements.[3]

Presently before the Court is plaintiffs' motion for summary judgment (Dkt. No. 19) and defendant's cross motion for summary judgment (Dkt No. 23).  Plaintiffs' motion for summary judgment seeks a determination by the Court as a matter of law:

> 1.    that plaintiffs own the property to the west of defendant's 40-foot strip;

---

[1] Throughout the parties' submissions, this area is referred to as the "40-foot railroad strip" or the "Former Railroad Property".

[2] Plaintiffs claim that the subject strip runs north-to-south through the Koepp/Place and Zwigard properties.

[3] The hearing was scheduled for January 20, 2009.  However, the matter was removed to this Court prior to the hearing date.

2.      that plaintiffs have rights-of-way by foot crossing the entire length of defendant's 40-foot strip;

3.      that plaintiffs have three vehicular rights-of-way across defendant's 40-foot strip;

4.      permanently enjoining defendant from erecting any fence, or in the alternative, permitting defendant to erect only 30 feet of fencing on the southern portion of the Koepp/Place property and no fencing on the Zwigard property.

Defendant's cross motion seeks summary judgment on the cross claims.  Specifically, defendant seeks the following relief:

1.      A determination that defendant holds a fee interest in the 40-foot strip;

2.      A determination that, to the extent there is property west of the foot strip, plaintiffs do not own said property;

3.      A determination that title to property west of the 40-foot strip is vested in defendant;

4.      A determination that plaintiffs do not have any easement to cross defendant's property.

## II.    FACTUAL BACKGROUND[4]

The facts, unless otherwise noted, are undisputed.  In 1832, David and Sally Jane Holtslander conveyed a parcel of land in Aurora, designated as lot number 34, in the Township of Scipio, to Samuel Mandell ("Mandell").  The deed contained the following description of the premises:

. . . west to the shore of the Cayuga Lake thence southwardly along the shore of said Lake to the north west corner of land.

---

[4] The facts set forth in this section are taken from: (1) the Complaint; (2) the Answer; (3) Plaintiffs' Statement of Material Facts; (4) Defendant's Statement of Material Facts; (5) the exhibits and evidence submitted by plaintiffs' in support of the motion for summary judgment; and (6) the exhibits and evidence submitted by defendant in opposition to plaintiffs' motion for summary judgment and in support of defendant's cross motion for summary judgment.

In 1851, Charles and Lemina Burling conveyed a parcel of land to Peter Fort ("Fort") described as follows:

> On the east by the said highway on the south by land conveyed on the 28th day of April, 1832 by [] Holtslander to []Mandell and on the west by the said Cayuga Lake containing one and one half acre of land.

**A.      Deeds conveying 40-foot railroad strip**

In 1872, Mandell and Fort transferred a strip of land along Cayuga Lake to Cayuga Lake Railroad Company ("Cayuga Railroad") necessary to build a railway.  The strip was used as a railroad bed by Cayuga Railroad and then by successor railroad companies, including the Lehigh Valley Railroad Company ("Lehigh Railroad").  The Mandell Deed contained the following description of the conveyance to Cayuga Railroad:

> Beginning in the track of the said Railroad as indicated on the Map & Survey thereof on file in the Clerk's Office of Cayuga County. Bounded on the north by the lot of Peter Fort and south by the lot of Richard Morgan, being a strip forty two feet long and forty feet wide Viz.  Twenty feet in width on each side measuring from the center of said Railroad.  It is agreed that the Company shall in no way interfere with the well now on the premises of said Mandell to impair its usefulness & in consideration of said Company digging a drain to connect the above mentioned well with the Lake.  The stone on the premises are to belong to said Company to be used for the purpose of a rip rap wall on said premises.
>
> Said Company shall also erect & maintain a crossing for teams over the tract to the Lake & fill in on the east side level with track the whole width of said forty two feet.

The Fort deed provided the following description of the conveyance to Cayuga Railroad:

> CONVEYS, for the purposes of their said railroad and to their successors assigns forever, a strip of land across the westerly end of the Village lot, on the west side of the Main street in Aurora aforesaid, known as the Burling Lot, twenty feet in width on the west from the center line of the said rail road track, as now staked out & laid down on a map of said railroad line on file in Cayuga County Clerk's Office, and twenty feet in width on the east from said center line, also a like strip of land to wit: twenty feet on the west and twenty feet on the east side of said center line as now staked out & mapped as aforesaid

4

across the westerly side of the homestead lot in Aurora aforesaid now owned & occupied by said Peter Fort.

The grant & conveyance of the two above described pieces of land are on the express condition that said Rail Road Company shall do & perform each of the following things to wit:

First, that said Rail Road Company shall at their own expense remove the barn on the said "Burling Lot" and place same on substantial stone abutment, where said Fort may direct and fill up same as convenient in all respects for use as the same now is and shall make & grade a good & convenient wagon road between said barn & the garden fence down to the said road track and shall make & maintain a good crossing for wagons over said rail road track on each of the above described pieces of land.

Following a series of conveyances and assignments, Lehigh Railroad became the title owner of the 40-foot strip. As a quasi-public utility company, Lehigh Railroad was required to seek approval from the Interstate Commerce Commission ("ICC") if Lehigh Railroad wished to abandon operations and cease maintaining the railway. Sometime prior to 1971, Lehigh Railroad sought such approval and on or around June 3, 1971, the ICC entered a "Certificate and Order" authorizing Lehigh Railroad to abandon the Ithaca to Auburn Line. The Order indicates that the Commission considered the protest of, "the President of Wells College that the right-of-way of the line to be abandoned be disposed of by the applicant in a manner not adverse to the environmental interests of the residents in the area". On July 30, 1976, the New York Commissioner of Transportation signed a release of its preferential right to acquire the lands of Lehigh Railroad allowing the lands to be sold to private citizens. Subsequently, Lehigh Railroad filed a petition for relief under section 77 of the Bankruptcy Act with the District Court for the Eastern District of Pennsylvania. On July 16, 1982, pursuant to the petition, the District Court entered a Consummation Order and Final Decree. The Consummation Order provided, *inter alia*:

> 3. Upon the Consummation Date, all of the assets of the Lehigh Valley Rail Road Company would vest in and become the absolute property

5

> of the reorganized company, subject to limited exceptions not applicable in this action, "free and clear of all claims, rights, demands, interests, liens and encumbrances of every kind and character, of the Debtor, its creditors, claimants and stockbrokers, whether or not properly or timely filed and whether or not approved, acknowledged or allowed in these proceedings".

The Consummation Date was September 30, 1982 and the Order was filed with the Cayuga County Clerk's Office on October 18, 1982.

In 1984, John Holland, Mary Holland and Lida Holland Churchville purchased the Former Railroad Property adjoining 311, 323, 327 and 331 Main Street, Aurora, New York.[5] The Holland's deed for the purchase of the 40-foot strip provided as follows:

> All that part of the Lehigh Valley Railroad Company's Auburn & Ithaca branch right of way (40 feet wide West of Lots 25 and 26 and 30 feet wide West of Lots 27, and 28), lying Westerly of, adjacent and contiguous to Tax Lots 25, 26, 27 and 28 according to Tax Map No. 181.16 of the Village of Aurora, Cayuga County, New York; bounded on the North by the Westerly projection of the Northerly line of said Lot No. 25 and on the South by the Westerly projection of the Southerly line of said Lot No. 28, containing 0.38 of an acre, more or less.
>
> This deed is delivered by the party of the first part and accepted by the parties of the second part UNDER AND SUBJECT to the following:
>
> (a) Visible easements and easements and restrictions of record.

On October 28, 2002, by deed, defendant took title and became the successor-in-interest to the interests of John Holland, Mary Holland and Lida Holland Churchville in the Holland Property.

---

[5] In October 1981, John Holland, Mary Holland and Lida Holland Churchville purchased the property commonly referred to as 323 Main Street, Aurora, New York.

**B.**     **Deeds conveying Fort/Mandell property** [6]

**1.**     **Fort to Pierson**

In 1877, the Executors of Peter Fort's estate conveyed Fort's land to Edward Pierson.  The deed contained the following descriptive language:

> On the north by a fence on the north side of said lot along the land extending from the road passing through the Village of Aurora aforesaid to Cayuga Lake, on the east by the said highway, on the south by land conveyed on the 28th day of April 1832 by the said David Holtslander to Samuel Mandell, and on the west by the said Cayuga Lake, containing one and a half acres of land be the same more or less and being the same premises conveyed to the said Peter Fort deceased by Charles Burling and wife by deed dated October 11, 1851.  Excepting and reserving therefrom any and all vested rights or interests which the Cayuga Lake Railroad or its assigns may have in the above . . . And all the estate, right, title, interest, property, possession claim and demand whatsoever . . . with the appurtenances to have and to hold forever.

**2.**     **Pierson to Sadler**

In 1878, Pierson conveyed the land to Maria A. Sadler.  The deed contained the following description:

> On the north by a fence on the north side of said lot along the land extending from the road passing through the Village of Aurora aforesaid to Cayuga Lake, on the east by the said highway, on the south by land conveyed on the 28th day of April 1832 by the said David Holtslander to Samuel Mandell, and on the west by the said Cayuga Lake.  Reserving and excepting however from the above described premises so much thereof as has been herefore [sic] conveyed to the Cayuga lake Railroad Company for the purposes and uses of their railroads and assigns.  The above being the same premises sold and conveyed on the Eleventh day of October 1851 by Charles Burling and wife to Peter Fort late of said Village of Aurora

---

[6] The deeds were annexed as exhibits to plaintiffs' motion papers.  The deeds were recorded and filed in the Cayuga County Clerk's Office and defendant has not challenged the authenticity of any deed.  To the extent that the deeds are over 20 years old, they are ancient documents pursuant Federal Rules of Evidence § 803(16) and will be considered by the Court within the context of this motion. *See Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F.Supp.2d 251, 264 (S.D.N.Y. 2003) (citing Wright & Miller, 7113(b)(8)).

deceased.  With the appurtenances and all the estate, title and interest therein of the said party of the first part.

**3.**     **Sadler to Morgan**

In 1883, Sadler conveyed the land to Maria Morgan.  The deed contained the following description:

> On the north by an evergreen hedge along the north line of said lot and along the lane extending from the road through the village of Aurora aforesaid to Cayuga Lake on the east by the said highway on the south by land conveyed on the 28th day of April, 1832 by said David Holtslander to Samuel Mandell and on the west by the East Shore of Cayuga Lake excepting and reserving however from the above described premises so much thereof as has been heretofore conveyed to the Cayuga Lake Rail Road Company for the purpose and use of this Rail Road, and its assigns . . . with the appurtenances and all the estate title and interest therein of the said party of the first part . . .

**4.**     **Morgan to Lyon**

In 1893, Morgan conveyed the land to Sanford G. Lyon, with the following description:

> Beginning on the east shore of Cayuga Lake, at the northwest corner of lands owned by Samuel D. Mandell, thence easterly by the northline of said Mandell lot to its intersection with the Main Street of the Village of Aurora, New York thence northerly along the west boundary of said Main Street 132 feet or thereabout, to lands of Maria Morgan, thence along the southline of said Morgan's land to the east shore of Cayuga Lake thence along the east shore of said Lake, to point of beginning.  Excepting and reviewing the above described premises as so much thereof as has been heretofore conveyed to the Cayuga Lake Rail Road Company for the purpose and use of this Rail Road, and its assigns. Witnesseth the appurtenances and all the estate, title and interest therein of the said part of the first part and the said Maria Morgan party of the first part does hereby covenant and agree to and with the said party of the second part, his heirs and assigns that the premises thus conveyed in the quiet and peaceable possession of said party of the second party, his heirs and assigns she will forever Warrant and Defend against any person whomever lawfully claiming the same, or any part thereof.

**5.**     **Mandell to Aurora Elgin Creamery Company**

In 1896, Mandell conveyed his property to the Aurora Elgin Creamery Company.  The
deed described the property conveyed and stated, *inter alia*:

> Beginning at the north-east corner of lands owned by the Aurora
> Royal Arch Chapter of Masons; running thence westerly along the
> north line of said chapter's land, and along the northline of lands
> owned by the Estate of Richard Morgan, deceased, to the lands
> conveyed by Samuel D. Mandell to the Cayuga Lake Rail Road Co.;
> thence northerly along the eastline of lands conveyed to said Rail
> Road Company to lands now owned by Sanford G. Lyon; thence
> easterly along said Lyon's southline to a point on the west line of
> Main Street of Aurora, N.Y., a distance of 42 feet and 4 inches from
> the point of beginning, thence southerly along the west line of said
> Main Street to place of beginnings containing 1/8 of an acre, be the
> same more or less.  Together with all rights of way, reservations and
> privileges mentioned in the conveyance of Samuel D. Mandell to said
> Cayuga Lake Rail Road Company; also any land originally a part of
> this premises lying west of said land conveyed to the said Cayuga
> Lake Railroad Company.

**6.      Aurora Elgin Creamery Company to Lyon**

In 1911, the Aurora Elgin Creamery Company conveyed the property to Sanford G. Lyon.
The deed contained the same language as above.

**7.      Lyon to Wells College**

In 1946, Lyon conveyed both properties to Wells College.  The deed provided, *inter alia*:

> Being the same premises conveyed by two certain warranty deeds to
> Sanford G. Lyon, first by Maria M. Morgan October 10, 1893 and
> recorded in Cayuga County Clerk's Office in Book 177 of Deeds at
> page 310 and second, by The Aurora Elgin Creamery Company Jan.
> 17, 1911, and recorded in said Clerk's Office in Book 201 of Deeds at
> page 215.  TOGETHER WITH all the rights of way, reservations and
> privileges mentioned in the conveyances of Samuel D. Mandell and
> Peter Fort to Cayuga Railroad Company; also any land originally a
> part of these premises lying west of said land conveyed to the said
> Cayuga Railroad Company.

> Being the same premises conveyed by two certain warranty deeds to
> Sanford G. Lyon, first by Maria M. Morgan Oct. 10, 1893 and
> recorded in Cayuga County Clerk's Office in Book 177 of Deeds at

page 310 and second, by The Aurora Elgin Creamery Company Jan. 17, 1911 and recorded in  said Clerk's Office in Book 201 of Deeds at page 215.  TOGETHER WITH all the rights of way, reservations and privileges mentioned in the conveyances of Samuel D. Mandell and Peter Fort to said Cayuga Lake Railroad Company; also any land originally a part of this premises lying west of said land conveyed to the said Cayuga Lake Railroad Company.

The two properties became known as the Lyon House and the Lake House and were maintained as rental properties by Wells College.[7]

### 8.    Wells College to Koepp and Place

In 2006, plaintiffs Koepp and Place purchased their lot from Wells College for $25,000.00.  The Koepp/ Place property is commonly referred to as 327 Main Street, Aurora, New York.  The property is described in the deed as follows:

> BEGINNING at a point in the west line of Main Street, at the southeast corner of Parcel "D", as shown on Filed Map K/33 in the Cayuga County Clerk's Office; thence running northerly along said west line, 88.33 feet to a point and iron pin; thence westerly, at an interior angle of 90 degrees 01' 20" with the last described line, 187.57 feet to a point and iron pin located in the east line of Parcel "E" on said map; thence southerly along the said east line and along the east line of Parcel "F" on said map, at an interior angle of 89 degrees 59'40" with the last described line, 84.79 feet to a point and iron pin at the southwest corner of aforesaid Parcel "D"; thence easterly along the south line of said Parcel "D", 187.63 feet to the point of beginning, the last described line forming an interior angle of 88 degrees 53'45" with the first line herein described.

The deed further described the premises as, "the same premises conveyed to the grantor by deed dated October 23, 1945".  Plaintiff filed an application for a building permit from the Village of Aurora and represented that the lot was not waterfront property.  The property runs about 84 feet north-to-south and is bordered on the north by the Zwigard property and on the

---

[7] In 1993, Wells College conveyed a portion of the property to Linda Lohn.  On the motion, Lohn provided an affidavit and stated that she bought the "Lyon House" from the College in 1993 and sold it back to the College in 2003.

south by defendant's main lot containing defendant's residence.  According to Koepp, the

property was formerly known as the Lake House.

On October 12, 2007, a corrective deed was prepared and subsequently filed in the

Cayuga County Clerk's Office.  The deed provided:

> The purpose of this deed is to correct the deed from Wells College to
> Cynthia J. Koepp and John D. Place dated October 4, 2006, recorded
> October 4, 2006 in Cayuga County Clerk's Office in Book 1281 of
> Deeds at Page 137 to include the rights of way, reservations and
> privileges set forth in deed by Peter Fort to The Cayuga Lake Railroad
> Company dated March 25, 1872 . . . and deed by Samuel D. Mandell
> and C.S. Mandell, his wife, to The Cayuga Lake Railroad Company
> . . . as set forth above.

### 9.   Wells College to Zwigards

In 2007, Todd and Paddington Zwigard purchased property commonly referred to as 331

Main Street, Aurora, New York from Wells College.  The deed contained the following language:

> Grantor quitclaims all the rights of way, reservations and privileges
> mentioned in the conveyance by Peter Fort to The Cayuga Lake
> Railroad Company by deed dated March 25, 1872, recorded May 27,
> 1872, in Cayuga County Clerk's Office in Book 133 of Deeds at Page
> 539, and also any land originally part of said premises lying west of
> said land conveyed to the said Cayuga Lake Railroad Company . . .

According to Todd Zwigard, 331 Main Street was commonly known as the Lyon House.

The property runs about 90 feet north-to-south and is bordered on the south by the Koepp/Place

property.  The property is not assessed as waterfront property.

## C.   Maps and Surveys

Defendant contends that there are four maps depicting the Holland Property, Zwigard

Property and Koepp/Place Property on file in the Cayuga County Clerk's Office.[8]  The first map

---

[8] Plaintiff contests the relevancy of the maps but does not argue that the maps are not properly authenticated.
The maps were annexed to defendant's motion papers and were filed and recorded in the Cayuga County Clerk's
Office.  To the extent that maps/surveys were referenced in deeds, they are admissible in evidence as ancient

is entitled Map & Profile of the Cayuga Lake Railroad 1871 ("1871 Railroad Map") .  The deeds from both Mandell and Fort make reference to the 1871 Railroad Map.  The map lacks any legend or scale.  The map contains a Certificate of the President and Engineer which states:

> . . . this map and profile are respectively the map and profile of the said company showing the route of the said railroad through the County of Cayuga from the Village of Cayuga to the northern line of Tompkins County.

On the motion, the parties have provided affidavits from expert witnesses.  Plaintiffs' expert, Robert Nessell, a professional abstractor and deed/title searcher, concluded that the map was prepared to show, "only the route of the said railroad through the county of Cayuga and opined that the map was not designed to, "accurately reflect the nooks and crannies of the shoreline".   Defendant's expert, Paul Geiss, a title examiner and owner/operator of Salt City Abstract Corporation, concluded that the map depicts the, "intended centerline of the railroad was to run along the shore of the Cayuga Lake".

The second map is a Title and Survey Map for the Estate of Sanford Lyon, dated October 20, 1945 (Map K-33) and filed in the Cayuga County Clerk's Office on July 26, 1946.  The map was referenced in the Deed from the Estate of Sanford Lyon to Wells College.  The third map is a Title and Survey Map for the Estate of Sanford Lyon, updated on June 17, 1958 (Map BB-72) and filed with the Cayuga County Clerk's Office on June 23, 1958.

Upon the motion, plaintiffs provided additional affidavits from a second expert, Dan Anderson, a land surveyor.  Mr. Anderson reviewed maps K-33 and BB-72 and noted that the maps contained a straight line with intermittent double dashes.  According to Mr. Anderson, those drawings represented the west line of the railroad property.  Mr. Anderson further noted that the

---

documents and will be considered by the Court within the context of the motions.  *See Burns v. U.S.*, 160 F. 631 (2d Cir. 1908).

maps contained a straight line of heavier weight followed by lighter and more irregular dashed lines west of the railroad property.  According to Mr. Anderson, this was the traditional way of indicating the edge of a body of water.  Mr. Nessell also reviewed K-33 and BB-72 and stated that the purpose of the maps was to depict ownership interest in the Estate of Lyon and the surrounding estates.  Mr. Nessell found the drawing of the shoreline to be "simplistic" and as such, concluded that the shoreline was not relevant to the purpose of the map. Mr. Geiss concluded that a close review of K-33 shows that the shoreline came up to the Former Rail Road Property.

The fourth map is a Title and Survey Map for the Estate of Joseph T. Webb dated June 1, 1965 (Map JJ-38) and filed with the Cayuga County Clerk's Office on June 21, 1965.[9]

On the motion, plaintiffs provided a Map and Survey of a Portion of Lands of Wells College (03-249) dated January 8, 1993 and filed with the Cayuga County Clerk's Office on October 20, 2003.   The Map and Survey were prepared by plaintiffs' expert, Dan Anderson.

## IV.     DISCUSSION

### A.     Standard for Summary Judgment

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial.  *See id*.  If the nonmovant fails to carry this

---

[9] Plaintiffs contend that this map is irrelevant for the purposes of the within motions.

burden, summary judgment is appropriate.  *See id.*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir.1994).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen 'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

**B.      Ownership Interest in Land West of 40-Foot Strip**

Plaintiffs claim ownership interest in the land west of defendant's 40-foot strip.[10] Defendant argues that: (a) plaintiffs' predecessors-in-interest did not claim any additional property to the west of the 40-foot strip and there is no proof that any land existed; (b) under the doctrine of accretion, title to any property created by lower lake levels is vested with defendant, the upland owner; and (c) defendant has a vested interest in the property by virtue of adverse possession.

**1.      Existence of Land West of 40-Foot Strip in 1872**

As an initial matter, the parties have asked the Court to determine, as a matter of law, whether land existed to the west of the 40-foot strip in 1872, when Mandell and Fort conveyed the strip to Cayuga Railroad.  Defendant argues that at the time of the conveyance, no lands were

---

[10] Defendant claims to hold a fee interest in the 40-foot strip and plaintiffs do not dispute that contention.

shown to exist on the 1871 Railroad Map (which was referenced in the Mandell and Fort deeds) and therefore, there was no property to the west of the 40-foot strip.  The parties rely upon the opinions of the respective experts and their conclusions with regard to the intent of the drafters of the maps and deeds maintained in the Cayuga County Clerk's Office.  Defendant's expert claims that based upon the 1871 Railroad Map, K-33 and BB-72, the railroad clearly abutted the lake and ran along the waterline.  Plaintiffs' experts interpret the maps differently and conclude that based upon the drawings and the "traditional way of indicating the edge of a body of water", there was land to the west of the strip at the time of Mandell and Fort's initial conveyance to Cayuga Railroad.

The experts offer vastly different opinions with regard to what the drafters/illustrators of the maps intended to depict and the purposes for which the maps were drawn.  The conflicting opinions of the parties' experts on genuine issues of material fact preclude the Court from deciding the issue on summary judgment.  *See Regent Ins. Co. v. Storm King Contracting, Inc*., 2008 WL 563465, at *13 (S.D.N.Y. 2008).  The issue of whether there was land to the west of the 40-foot strip in 1872 must be reserved to the fact-finder.   Accordingly, the motions for summary judgment on this issue are denied.

### 2.      Current Ownership of Land to the West of 40-Foot Strip

At plaintiffs' request, Mr. Anderson conducted a second survey of the subject area on March 10, 2008 and produced a survey map.[11]  Mr. Anderson noted the elevation of the lake was 381.2 feet and found the average distance between the western edge of defendant's property and the shoreline was 35 feet.  Therefore, regardless of whether land existed at the time of the

---

[11] The Map of Survey of Premises of Cynthia J. Koepp & John D. Place and Wells College does not contain any stamp indicating that it was filed in the Clerk's Office.

conveyances by Ford and Mandell to Cayuga Railroad, plaintiffs claim ownership interest in that land based upon their chains of title. Defendant argues that if there has been accretion of land caused by receding water, title in the accreted lands vests in defendant. In the alternative, defendant argues that to the extent that any such land is not underwater, defendant has a vested interest in such property by virtue of adverse possession.

To determine current ownership of the disputed parcel, the Court must examine the chains of title of deeds and interpret the language of said deeds. The sufficiency of record title depends upon the construction of the deeds, which is generally a question of law for the court. *See Pell v. Pell*, 65 A.D. 388, 389 (1st Dep't 1901); *see also Spencer v. Connolly*, 25 A.D.3d 832, 833 (3d Dep't 2006). It is well settled that a deed must be construed according to the intent of the parties and, further, that a court is to give effect and meaning, to the degree possible, to each and every phrase or part of the deed. *Carter v. Heitzman*, 198 A.D.2d 649, 649-650 (3d Dep't 1993) (citing 43 N.Y. Jur.2d, Deeds, § 235, at 438-439). Real Property Law § 240(3) provides, in pertinent part, that "[e]very instrument creating [or] transferring . . . an estate or interest in real property must be construed according to the intent of the parties, so far as such intent can be gathered from the whole instrument, and is consistent with the rules of law." *Modrynski v. Wolfer*, 234 A.D.2d 901, 902 (4th Dep't 1996). The "intent" at issue is the objective intent of the parties manifested by the language of the deed; unless the deed is ambiguous, evidence of unexpressed, subjective intentions of the parties is irrelevant. *Id.* "It is only when language used in a conveyance 'is susceptible of more than one interpretation' that the courts will look into surrounding circumstances". *Id.* (citing *Loch Sheldrake Assocs. v. Evans*, 306 N.Y. 297, 304 (1954)). "Courts today de-emphasize the formal parts of a deed and hold, in the construction of deeds, that the language of a deed must be so interpreted and applied as to be meaningful and valid, and the

16

intent of the parties, as evidenced by the deed and the circumstances surrounding the making thereof, must be given expression wherever it is possible to do so without violating law and reason". *328 Owners Corp. v. 330 W. 86 Oaks Corp*., 8 N.Y.3d 372, 381 (2007).  It is well settled that where an inconsistency exists between a deed and a map to which it refers, the deed description should prevail.  *Hess v. Baccarat*, 210 A.D.2d 544, 545 (3d Dep't 1994); *see also Decker v. City of New York*, 216 A.D. 334, 336 (2d Dep't 1926) (holding that where there is conflict in the terms of a deed and a map, it is important to consider the intention).

### a.      Property Interests of Mandell and Fort Prior to 1872

Before the Court may rule, as a matter of law, with regard to the parties property interests in any land west of the 40-foot strip, the Court must determine the extent of Mandell and Fort's property interests **prior to** their conveyances to Cayuga Railroad.  Therefore, the Court begins the analysis with the deeds from Holtslander and Burling conveying the original parcels to Mandell and Fort.  The deeds from Holtslander to Mandell and Burling to Fort included the following pertinent language respectively regarding the western boundary of each parcel, ". . . west to the shore of the Cayuga Lake thence southwardly along the shore of said Lake" and  ". . . west by the said Cayuga Lake".  Plaintiffs argue that based upon these descriptions, there is no question that the Mandell and Fort properties extended to the lake's shore.

Where the boundary is limited to the bank or shore, it follows equally that it extends to the low water mark, because obviously what is meant by the bank or shore is the line where the land touches the water.  *Hammel v. Camp Ranger*, 275 A.D. 23, 31 (3d Dep't 1949).  Bounding a lot on a small, inland, fresh water lake, by the 'shore' or 'shore of said lake', and running the description 'along the shore', in the absence of any words of limitation or reservation, includes the space between the low water and high water marks of the lake.  *Carlino v. Barton*, 76 Misc.2d

240, 242 (N.Y.Sup. 1973) (holding that only an express reservation or restriction in the deed, such as running the description to the shore at high water mark, will rebut the presumption and exclude or reserve title in the shore or beach between low and high water mark) (citing *Halsey v. McCormick*, 13 N.Y. 296, 297 (1855)); *see also Oakes v. De Lancey*, 133 N.Y. 227, 232 (1892) (holding that 'by the shore,' would follow the line of low water).

Interpreting the plain language of the deeds, including the boundary restrictions, the Court concludes that the western boundary line of the property conveyed to Mandell and Fort was the low water mark of Cayuga Lake.  *See also Stewart v. Turney*, 237 N.Y. 117 (1923) (holding that a description, "running west to Cayuga lake and then 'along the east shore of the lake", carried the line to the lower water mark and the grantor had title to that line).

### b.    Property Interests Retained by Mandell and Fort

Plaintiffs argue that Mandell and Fort did not convey their property west of the 40-foot strip to the shore of Cayuga Lake to Cayuga Railroad.  Plaintiffs claim that both deeds conveyed only a specific 40-foot strip (20 feet in each direction from the center of the tracks).  Defendant asserts that the lack of any reference in the Fort or Mandell deeds retaining any interest on the west side of the railroad is consistent with the 1871 Railroad Map that the fact that the railway was to run along the edge of the water line.

A fair and reasonable interpretation of the terms and plain language used in the Mandell and Fort deeds to Cayuga Railroad excludes the land west of the 40-foot railroad strip.  The deeds describe definitive portions of land as "being a strip 42 feet long and 40 feet wide . . . 20 feet in width in each side measuring from the center of the railroad" and "20 feet in width on the west from the center line of the said rail road track . . . and 20 feet in width on the east from said center line".  Accordingly, the metes and bounds descriptions in the deeds did not include the lands

18

sought herein by defendant.  *See Low v. Webb*, 268 A.D. 104, 113 (3d Dep't 1944) (description of land in deed was limited to monumented corners which had been established as the result of a survey which controlled and restricted the area of land conveyed).  There is nothing in the deed from Mandell or Fort from which the Court can infer any intention by the grantors to include in the conveyance any land west of the 40 foot strip.  Defendant's argument that references to the 1871 Railroad Map in both the Mandell and Fort deeds indicates that Mandell and Fort intended to convey all property west of the strip to the railroad is without merit.  As previously discussed, the intent of the drafters of the 1871 Railroad Map is an issue reserved for the fact finder.  However, even if the Court accepts defendant's argument and finds that the 1871 Railroad Map and the deeds are inconsistent, based upon well-settled law in New York, the clear language of the deeds will control.  *See Mount v. Hambley*, 22 Misc. 454 (1898) (holding that where the land in question was not included in the grant, no title passed).  Defendant has not identified any other express or implied agreement to suggest otherwise.  *See Cullen v. Vill. of Pelham Manor*, 2009 WL 1507686, at *4 (S.D.N.Y. 2009) (the disputed parcel was not included in the deed or contract of sale and therefore, regardless of what the parties intended, they actually conveyed a parcel that did not include the disputed property).  Accordingly, the Court finds that Mandell and Fort did not convey land west of the 40-foot strip to the Cayuga Railroad.

Now, having determined that Mandell and Fort retained title in land west of the 40-foot strip, the Court must analyze the remaining deeds in the chains of title to determine whether or not plaintiffs' predecessors-in-interest retained title to such land.

### c.  Remaining Deeds in Chains of Title

Plaintiffs argue that all deeds in the Mandell and Fort chains of title conveyed all the property previously owned by Mandell and Fort to the lakeshore, excepting the 40-foot strip.

19

Defendant contends that plaintiffs' predecessors-in-interest did not claim any interest in any property west of the metes and bounds description in the respective deeds.

As this action is an RPAPL Article 15 action, the burden is on plaintiffs to establish, by a preponderance of the evidence, that the disputed property is within their chains of title. *State v. Moore*, 298 A.D.2d 814, 815 (3d Dep't 2002). On the motion, plaintiffs claim to have submitted unbroken chains of title. Such a showing is presumptive evidence of ownership at the time of the commencement of the action. *New York and Brooklyn Suburban Inv. Co. of New York v. Leeds*, 100 Misc.2d 1079, 1084 (N.Y.Sup. 1979) (citing *Helterline v. People*, 295 N.Y. 245 (1946)).

All deeds in the chains of title contain one of the following descriptions: (1) ". . . and on the west by the said Cayuga Lake";  or (2) ". . . on the west by the East Shore of Cayuga Lake" or; (3) ". . . thence along the east shore of said Lake"; or (4) "any land originally a part of this premises lying west of said land conveyed to the said Cayuga Lake Railroad Company".  The deeds from Wells College to Koepp/Place and Zwigard described the property as, "the same premises conveyed to the grantor by deed dated October 23, 1945".

Defendant has not challenged plaintiffs' chains of title or claimed that any gaps exist. Based upon the record, the Court concludes that plaintiffs have established unbroken chains of title dating back to 1832.  Upon a review of the language in the deeds, the Court finds no ambiguity and therefore, must construe the deed according to the intent of the parties.  Each deed in the chains of title contains language that expressly conveyed land  "along" or "on" or "by" Cayuga Lake.  Based upon the documentary evidence, title to the land west of the 40-foot strip was consistently held by plaintiffs' predecessors in interest.  Further, based upon the deeds from Wells College to the plaintiffs, the rights to any land to the west of the 40-foot strip vested with plaintiffs at the time of the conveyances.  Consequently, the court must determine whether or not

defendant subsequently acquired title to the disputed land by virtue of adverse possession.[12]

### 3.    Adverse Possession

Defendant argues, to the extent that any land to the west of the 40-foot strip is not underwater, that defendant and her predecessors-in-interest have maintained open, notorious, continuous and undisputed use of such property for 24 years.  Plaintiffs argue that defendant's actions were not "open and notorious" for the required 10-year prescriptive period.

To establish a claim for adverse possession, a claimant must prove by clear and convincing evidence that her possession was: "(1) hostile and under claim of right; (2) actual; (3) open and notorious; (4) exclusive; and (5) continuous for the required period".  *Chion v. Radziul*, 2009 WL 1478482, at *1 (2d Dep't 2009) (citing *Walling v. Przybylo*, 7 N.Y.3d 228, 232 (2006)).  As to "open and notorious", defendant must establish that the use was somehow open and notorious to the owner.  *See City of Kingston v. Knaust*, 287 A.D.2d 57, 60 (3d Dep't 2001) (holding that newspaper and magazine articles failed to raise an issue of fact on the issue of notice to the owner); *see also Bd. of Managers of Soho Int'l Arts Condo. v. City of New York*, 2005 WL 1153752, at *8 (S.D.N.Y. 2005) (holding that possession must be open and notorious so that the true owner and others in the community are given notice of the adverse possession) (citing *Ray v. Beacon Hudston Mt. Corp.*, 88 N.Y.2d 154, 160 (1996)).  Once the elements of open and continuous use for the prescribed period have been satisfied, a presumption arises that such use was hostile and the burden shifts to the owner to show that the use was permissive.  *Pickett v. Whipple*, 216 A.D.2d 833, 834 (3d Dep't 1995) (holding that the open and continuous use of a water system for 32 years gave rise to the presumption of hostility).

---

[12] Defendant states that if there has been an accretion of land caused by receding water, title in the accreted lands vests with defendant as the upland owner.  The issue of accretion is moot as the Court has determined that Wells College conveyed ownership interest in land west of the 40-foot strip to plaintiffs.

In this matter, the claim of possession is predicated upon an unwritten claim of title. Therefore, defendant must also establish that the disputed area was either "usually cultivated or improved" or "protected by a substantial enclosure". *Gorman v. Hess*, 301 A.D.2d 683, 684 (3d Dep't 2003); *see also Weinstein Enter., Inc. v. Cappelletti*, 217 A.D.2d 616, 617 (2d Dep't 1995). "The requisite character of the acts of improvement sufficient to supply the record owner with notice of an adverse claim will vary with 'the nature and situation of the property and the uses to which it can be applied' and must 'consist of acts such as are usual in the ordinary cultivation and improvement of similar lands by thrifty owners' ". *Gallas v. Duchesne*, 268 A.D.2d 728, 730 (3d Dep't 2000) (quoting *Ray*, 88 N.Y.2d at 160). If evidence fails to demonstrate that the usual cultivation of the disputed parcel or that the protected enclosure continued for the full 10-year period, title cannot be established by adverse possession. *Mohawk Paper Mills Inc. v. Colaruotolo*, 256 A.D.2d 924, 926 (3d Dep't 1998); *see also Jakobson v. Chestnut Hill Prop., Inc.*, 106 Misc.2d 918, 926 (N.Y. Sup. 1981). Trimming trees, weeding, removing debris and planting an occasional flower fails to establish an improvement within the meaning of the RPAPL. *See Yamin v. Daly*, 205 A.D.2d 870, 871 (3d Dep't 1994) (citing RPAPL § 522); *see also Sadowski v. Taylor*, 56 A.D.3d 991, 995 (3d Dep't 2008) (holding that activities such as building fire pits, planting trees and adding fill may be deemed non-adverse). The RPAPL provides that "de minimis non-structural encroachments including . . . hedges, shrubbery, plantings," as well as "acts of lawn mowing or similar maintenance . . . shall be deemed to be permissive and non-adverse." *Cullen*, 2009 WL 1507686, at *6 (citing N.Y. RPAPL § 543).

In the case at hand, defendant claims that she posted signs to welcome guests to her back yard, enjoyed exclusive use of the property and regularly granted and/or denied permission to neighbors to access the water. In support of her position, defendant provided affidavits from non-

22

parties including: Laura Holland[13]; Rosemary Jordan (former neighbor of defendant); Frank Zimdahl and Cathy Zimdahl (defendant's neighbors); Thomas Armstrong (resident of the Lake House from 1990 - 2004); John Batruch (resident of the Lake House from 1990 - 1998 and  the Lyon House from 1998 - 2002); Gretchen Orschiedt (resident of the Lake House from 1984 to 1985); John Clarke (former resident of the Village of Aurora).  The neighbors and former tenants of the Lake House and Lyon House claim that defendant posted signs that indicated defendant's control and ownership of the disputed land.  Further, the neighbors claim that they asked permission and that defendant allowed them to use the disputed property.

In opposition, plaintiffs argue that defendant's actions were not "open and notorious"  as to Wells College during the years that Wells College was the title owner of the land west of the 40-foot strip.  On the motion, plaintiffs provided affidavits from the following non-parties: William A. Burns (Treasurer and CFO of Wells College from 1981 until 1988); Susan Tellier (Treasurer and CFO of Wells College from 1989 - 1993); Diane L. Hutchinson (Vice President and Treasurer of Wells College since 1996); Arthur Bellinzoni (resident of Aurora); Bruce Campbell Byrne (former Aurora resident), Jocelyn Webb Pedersen (resident of the Lake House from 1988-2000); Cheryl Walsh (resident of the Lake House in 2004); James Stephen Taylor (resident of the Lyon House from 1968 - 1974); Laura Purdy (resident of the Lyon House from 1986 - 1988); and Linda Lohn (resident of the Lyon House from 1991 until 2003).[14]  The Wells College employees averred that they were not aware that tenants of the Lyon or Lake House asked permission to access the lakeshore and further claim that they never noticed any signs on

---

[13] Laura Holland is the defendant's sister-in-law and has resided at the Holland Property since 1983.  Ms. Holland stated that since 2000, defendant authorized her to manage and maintain said property.

[14] Lohn alleges that she bought the house from Wells College in 1993 and sold it back to Wells College in 2003.

defendant's property.  The Wells College employees stated that they had no notice that defendant, or any other party, made a claim to the property west of the 40-foot strip.   The neighbors and former tenants of the Lyon House and Lake House claim that they regularly traversed the old railroad strip to access the shore to the west and assumed they were free to cross at any point and made free use of the shore without complaints.

Having reviewed the record, the Court finds that the nature and duration of defendant's alleged adverse possession is presented in conflicting affidavits thereby precluding an award of summary judgment. *See BME Three Towers, Inc. v. 225 E. Realty Corp.*, 3 A.D.3d 444, 446 (1st Dep't 2004) (holding that summary judgment on the issue of adverse possession was not warranted since there were questions of fact and credibility among the evidence, including affidavits). Summary judgment is an improper remedy in an adverse possession action where material issues of fact remain. *Piasecki v. Stauble*, 161 A.D.2d 977, 978 (3d Dep't 1990) (holding that at the summary judgment stage, an "unclear" record containing "conflicting" evidence militates against awarding summary judgment to either party).

Even assuming defendant could establish open and notorious possession for the statutory period, the record is devoid of any evidence that defendant improved the disputed area or that defendant protected the disputed area by a substantial enclosure for the statutory period.  In support of claimed improvements, defendant relies upon the affidavit of John Bartruch.  Mr. Bartruch stated that his son mowed 500 feet of lake front property for defendant from 1998 until 2002 and that he "approached John Holland and explained to him that it was my hope to assist him in improving the lakefront area behind the Lyon House by planting flowers, building steps and removing debris".  Moreover, Mr. Bartruch claims that, "[p]rior to my moving away in 2002, John Holland undertook to having the stone wall originally built by the railroad company

restored".  Mr. Bartruch's unsubstantiated assertions, without more, are insufficient to constitute an improvement that existed for the statutory period.  Mr. Bartruch does not aver that defendant actually built any steps or rebuilt a stone wall or that such improvements existed or continued for the full 10-year period.  With regard to mowing the lawn, planting flowers and removing debris, such maintenance is non-adverse and further, there is no evidence that defendant undertook such maintenance for the statutory period.

As to the requirement for a substantial enclosure, plaintiffs claim that defendant did not erect any fencing until 2006.  In her affidavit, Ms. Holland averred that, "[t]o protect our property and our guests, I took it upon myself to have a suitable construction fencing placed on our property".[15]  However, Ms. Holland does not state when such fencing was erected.  Further, the Wells College employees contend that no fences or barriers were erected during the time that Wells College owned the land to the west of the 40-foot strip.  Therefore, the Court finds no evidence in the record that defendant enclosed the disputed land for the required statutory period.

Based upon the record, issues of fact exist which prevent the Court from determining, as a matter of law, that defendant had a vested interest in any property west of the 40-foot strip by virtue of adverse possession.  Accordingly, defendant's motion for summary judgment on this issue is denied.

## C.   Easements

Plaintiffs claim to have two different easements to cross defendant's property.  Plaintiffs claim to have an easement "by foot" across the entire length of the 40-foot strip by foot and also

---

[15] In Defendant's Statement of Material Facts, defendant asserts that, "on October 18, 2008, Laura Holland came home to find that the fencing had been torn down and called the Cayuga County Sheriff".  Defendant further claims that, "the investigator state[d] that he spoke with 'Donald Todrin who stated that he was a house guest of Paddington Zwigard, and that he had taken the fencing down for P. Zwigard'".  Plaintiffs do not dispute these contentions.

claim three vehicular easements of the property.[16]  Plaintiffs argue that the easements exist due to

necessity, prescription/adverse possession and by way of express grants in deeds in plaintiffs'

chains of title.

### 1.        Easement by Necessity

Plaintiffs argue that the easements are implied by necessity since, at the time of the

conveyances to Cayuga Railroad, Mandell and Fort would have left themselves no means of

accessing the lakeshore property without such crossings.  Defendant argues that an easement by

necessity cannot exist as Cayuga Lake is a navigable body of water.

To establish an easement by necessity, plaintiffs must prove: (1) a separation of the title;

(2) that before the separation takes place, the use, which gives rise to the easement, shall have

been so long continued and so obvious or manifest as to show that it was meant to be permanent;

and (3) that the easement is necessary to the beneficial enjoyment of the land granted or retained.

*Heyman v. Biggs*, 223 N.Y. 118, 125 (1918).  An implied easement by necessity is extinguished

when the necessity ceases.  *Fischer v. Liebman*, 137 A.D.2d 485, 488 (2d Dep't 1988) (citing

*Palmer v. Palmer*, 150 N.Y. 139 (1896) (holding that a right of way of necessity is not a perpetual

right of way, but continues only so long as the necessity exists).  If circumstances change so that

the easement is no longer necessary for access to the lot, then the easement by necessity ceases.

*Valicenti v. Schultz*, 27 Misc.2d 801 (N.Y. Sup. 1960).  Convenience alone can form no basis for

such an easement. *Carman v. Hewitt*, 105 N.Y.S.2d 239, 249 (N.Y. Sup. 1951); *see also Morrow*

*v. Gerber*, 207 Misc. 597, 601 (N.Y.Sup. 1955) (holding that the use of a path across the

defendants' property was undoubtedly a matter of convenience to certain of the plaintiffs but not

---

[16] Plaintiffs allege that the vehicular rights-of-way include two as described in the Fort deed and one
described in the Mandell deed.

necessary for the reasonable enjoyment of their property) .  A way of necessity must be strictly

necessary and if land is accessible by navigable water, no way of necessity exists.  *McQuinn v.*

*Tantalo*, 41 A.D.2d 575 (3d Dep't 1973); *see also Peasley v. State*, 102 Misc.2d 982, 991

(N.Y.Ct.Cl.1980) (it is the general rule, that where there is access to a property over a navigable

body of water, an easement by necessity over a land route may not be obtained) (citing *People v.*

*Canal Appraisers*, 33 N.Y. 461 (1865)).  The burden to establish that a lake is not navigable is

upon the party seeking the easement.  *Id*.

In this case, plaintiffs have failed to establish that the easements exist by way of necessity.

New York courts have held that Cayuga Lake is a navigable body of water.  *New York State*

*Water Resources Comm'n v. Liberman*, 37 A.D.2d 484, 488 (3d Dep't 1971); *see also People v.*

*Prescott*, 11 Misc.3d 230, 232 (N.Y.City Ct. 2005).  Plaintiffs present no evidence to the contrary.

Moreover, based upon the record, even if an easement by necessity existed at the time of the

Mandell and Fort conveyances to the railroad, the easements are no longer necessary due to

changes in circumstances.  Specifically, plaintiffs have not established that the easements over

defendant's property are necessary to gain access to their property west of the 40-foot strip.

Indeed, T. Zwigard and Koepp submitted affidavits stating that they access their "lakefront

property on the west side of the Holland's strip by walking north, around the Holland strip, and

using the Village right-of-way".

### 2.        Easement by Prescription or Adverse Possession

In the alternative, plaintiffs argue that the right to cross defendant's 40-foot strip has been

gained by adverse possession.  Defendant asserts that any use of defendant's property by

plaintiffs and their predecessors-in-interest was a neighborly accommodation and therefore,

defendant and her predecessors were not on notice of plaintiffs' hostile claim.

27

To establish a prescriptive easement, plaintiffs must demonstrate that the use of the land was adverse, open, notorious, continuous and uninterrupted for the 10-year prescriptive period. *State v. Johnson*, 45 A.D.3d 1016, 1019 (3d Dep't 2007) (citing *Bouton v. Williams*, 42 A.D.3d 795, 796 (2007)). The requisite time period may be established by taking into account the period of use by a predecessor in title so long as there is an unbroken chain of privity. *Congregation Yetev Lev D'Satmar v. County of Sullivan*, 59 N.Y.2d 418, 424 (1983). New York courts have held:

> For purposes of adverse possession the requisite continuity of possession may be shown by combining the successive possessions of several persons between whom privity exists, in a process called tacking. In other words, the use or possession by the predecessors in title, also meeting the requirements of adverse possession, may be tacked on to one's adverse use or possession to establish the statutory period, as long as there is an unbroken chain of privity between the adverse possessors. Where the successive possessions of those in privity with each other, when tacked together, constitute one continuous adverse possession for the statutory period, it will be sufficient, provided the other elements of adverse possession are also present.

*Bayshore Gardens Owners, Inc. v. Meersand*, 2008 WL 3877173, at *5 (N.Y.Sup. 2008) (citing 2 N.Y. Jur.2d Adverse Possession § 58); *see also Belotti v. Bickhardt*, 228 N.Y. 296, 306 (1920).

If plaintiffs can establish open, notorious and uninterrupted use of the access way, the burden shifts to defendant to negate the presumption by showing that the using of the access was permissive. *Brocco v. Mileo*, 144 A.D.2d 200, 201 (3d Dep't 1988). A prescriptive easement cannot be established if permission to use the property, "can be inferred where the relationship between the parties is one of neighborly cooperation and accommodation". *Penn Heights Beach Club, Inc. v. Myers*, 42 A.D.3d 602, 606-607 (3d Dep't 2007) (citing *Allen v. Mastrianni*, 2 A.D.3d 1023, 1024 (2003)). Specifically, "[w]here permission can be implied from the beginning,

no adverse use may arise until the owner of the servient tenement is made aware of the assertion of a hostile right" *Id.*

In this case, plaintiffs did not take possession of their property until 2006 (Koepp/Place) and 2007 (Zwigard).  Therefore, in order to establish an easement by adverse possession, plaintiffs must demonstrate continuous use of the strip by their predecessor in interest, Well College.  On the motion, plaintiffs provided affidavits from tenants who resided in the Lake House and Lyon House from 1991 until 2003 and claim that they crossed the strip freely and without permission from anyone.  However, absent from the record are any affidavits from tenants of the Lake or Lyon Houses claiming use of the strip between 2003 and 2006.  The record contains no evidence of continuous use of the strip during that time.[17]  Thus, plaintiffs have failed to establish continuous and uninterrupted use of the easement for the requisite time period.  This factor alone precludes the Court from awarding summary judgment to plaintiffs on the issue of adverse possession.

Even assuming plaintiffs could establish continuous use, the affidavits submitted on the motion offer conflicting evidence regarding neighborly accommodation.  Plaintiffs provided affidavits from tenants who claim that they did not seek defendant's permission as they believed they had the right to use the strip.  Conversely, defendant provided affidavits from individuals who stated that defendant generously permitted them to access the lakefront.  The conflicting affidavits present questions of fact with regard to permission to use the strip, therefore, plaintiffs' motion for summary judgment on this issue is denied.  *See Barlow v. Sapziani*, 2009 WL

---

[17] Plaintiffs provided an affidavit from Diane Hutchinson, the Vice President and Treasurer of Wells College from 1996 until present. Ms. Hutchinson states, "I never told the tenants that they had to ask permission from anyone to access the lakeshore". However, Ms. Hutchinson does not claim that she crossed the subject strip and further, she does not claim that she has any independent knowledge that any of the tenants of the Lyon or Lake Houses accessed the strip during the relevant time period.

1544441, at *1 (3d Dep't 2009) (holding that while permission may be implied from neighborly cooperation, there was evidence in the record that the parties rarely conversed and that in fact, tension existed between the parties prior to the litigation).

> 3.     **Easement of Record**

Plaintiffs argue that Mandell and Fort, as grantors to the railroad, retained an express right-of-way or easement to allow occupants of the estate to access the shoreline.  Plaintiffs further contend that this easement runs with the land to the benefit of the grantor's successors-in-interest.  Defendant argues that plaintiffs do not have an easement of record because the language in the Mandell and Fort deeds is ambiguous and lacked any intent to bind any successors to the conditions contained therein.  Defendant also argues that the railroad was under a statutory obligation to maintain reasonable crossings for adjoining landowners and therefore, the language of the deeds indicates an express condition rather than a continuing easement.  In the alternative, defendant contends that any easement created by the deeds was terminated by the Consummation Order.

> a.     **Express Easement**

Under New York law, in order to establish an express easement, "there must be a writing containing plain and direct language evincing the grantor's intent to create a right in the nature of an easement rather than a revocable license."  *Devine v. Vill. of Port Jefferson*,  849 F.Supp. 185, 188 (E.D.N.Y. 1994).  There are two types of express or record easements: (1) an easement appurtenant which contemplates a dominant and a servient estate and provides an interest in land; and (2) an easement in gross which is a personal, non assignable, noninheritable privilege or license.  *Webster v. Ragona*, 7 A.D.3d 850, 853, n.1 (3d Dep't 2004).   In determining intent, the Court must bear in mind the long established principle that an easement in gross will not be

presumed where it can fairly be construed to be appurtenant to land. *Chain Locations of Am., Inc. v. Westchester County*, 20 Misc.2d 411, 414 (N.Y.Sup.1959) (citing *Wilson v. Ford*, 209 N.Y. 186, 196 (1913)).  An easement appurtenant is created when the easement is: (1) conveyed in writing; (2) subscribed by the person creating the easement; and (3) burdens the servient estate for the benefit of the dominant estate.  *Id*.  The policy of law favoring unrestricted use of realty requires that where there is any ambiguity as to the permanence of the restriction to be imposed on the servient estate, the right of use should be deemed a license.  *New York State Elec. & Gas Corp. v. Aasen*, 157 A.D.2d 965, 967-968 (3d Dep't 1990) (citing *Willow Tex v. Dimacopoulos*, 68 N.Y.2d 963, 965 (1986)).

The fact that an easement does not employ the term "permanent" or include an express reference to bind successors is not dispositive.  *Webster*, 7 A.D.3d at 854.  The grant of an easement appurtenant does not need to include language describing it as permanent because an easement, once created, necessarily runs with the land.  *Id*.  An already existing easement appurtenant passes to the grantee of the dominant estate as an 'appurtenance' even in the absence of any express reference. *Schwab v. Whitmore, Rauber & Vicinus Co., Inc*., 245 A.D. 174 (4th Dep't 1935); *see also Corrarino v. Byrnes*, 43 A.D.3d 421, 423 (2d Dep't 2007) (an easement passes to subsequent owners of the dominant estate through appurtenance clauses, even if it is not specifically mentioned in the deed).  Once created, the easement runs with the land and can only be extinguished by abandonment, conveyance, condemnation, or adverse possession.  *Id*.  An easement is an appurtenance and passes under a recital in a deed reading, "with the appurtenances thereto," without specific mention or description.  *Air Stream Corp. v. 3300 Lawson Corp*., 2009 WL 1857340, at *3 (N.Y. Sup. 2009) (citing *Spencer v. Kilmer*, 151 N.Y. 390 (1897)).  Owners of a servient estate are bound by constructive or inquiry notice of easements which appear in

deeds or other instruments of conveyance in their property's direct chain of title.  *Corrarino,* 43 A.D.3d at 423.  The recording of a deed constitutes constructive notice.  *Id.*

In the case at hand, the clear language of the Mandell and Fort deeds reveals an intent by the grantors to retain the right to cross over the 40-foot strip.  The deeds do not contain any language restricting the easement, reserving the right of way to Mandell and/or Fort, or retaining any right of revocation.  *See Webster*, 7 A.D.3d at 854.  Defendant argues that the language of the deeds is ambiguous and lacked any intent to bind any successors.  The Court disagrees.  The language in each deed is clear and consistent.  Each conveyance contains the terms, "with the appurtenances . . " or "together with all rights of way, reservations and privileges mentioned in the conveyances of Samuel D. Mandell and Peter Fort . . .".  Even assuming that the language is ambiguous, the easement was created by express reference and thus, runs with the land.  Therefore, even without specific language referring to the easement, upon its creation, the easement passed to the subsequent owners of the parcels, including plaintiffs.

Defendant argues that the language in the deeds establishes limited covenants personal to the railroad company rather than an express easement.  Defendant contends that the New York General Rail Road Act, in effect at the time of the conveyance, imposed a statutory duty upon the railroad to maintain reasonable crossings for adjoining land owners.  As such, defendant claims that once the railway ceased operations, the railway and its successors (including defendant), were under no obligation to maintain a crossing or access across the former railway.

Section 52 of the Railroad Law provides, in pertinent part:

> Every railroad corporation, and any lessee or other person in possession of its road, shall, before the lines of its road are opened for use, and so soon as it has acquired the right of way for its roadway, erect and thereafter maintain fences on the sides of its road of height and strength sufficient to prevent cattle, horses, sheep and hogs from

32

> going upon its road from the adjacent lands, with farm crossings and openings with gates therein at such farm crossings whenever and wherever reasonably necessary for the use of the owners and occupants of the adjoining lands, and shall construct where not already done, and hereafter maintain, cattle-guards at all road crossings, suitable and sufficient to prevent cattle, horses, sheep and hogs from going upon its railroad.

*See* Railroad Law § 52.  Under the statute existing at the time of execution, the railroad was required to maintain a farm crossing even if the deed was silent on this aspect.  *Neuhaus v. Long Island R.R. Co.*, 30 A.D.2d 825, 826 (2d Dep't 1968).  However, if a deed did not specifically provide for a farm crossing, the grantor was sometimes relegated to a suit at law for damages.  *Id.*  Courts in New York have construed similar clauses to run with the land.  *See Concklin v. N.Y. Cent. & H.R.R. Co.*, 149 A.D. 739 (2d Dep't 1912) (holding that a covenant by a grantor of a railroad right of way to maintain sufficient fences is an affirmative covenant running with the land).  Therefore, the Court finds defendant's argument to be without merit.

Based upon the record, the deeds from Mandell and Fort to Cayuga Railroad created an express easement permitting the grantors to cross the 40-foot strip.  Such easements ran with the land and pursuant to the chains of title, the Court finds that upon the conveyances from Wells College, plaintiffs possessed an express easement over the 40-foot strip.  Having determined that an easement existed, the Court must address the nature and extent of the easement.

**b.      Nature and Extent of Easement**

Plaintiffs argue that the Fort and Mandell deeds clearly allowed the owners of the dominant estate to cross the 40-foot strip, on foot, "anywhere they pleased".  Plaintiffs also argue that they have three vehicular rights-of-ways over defendant's 40-foot strip.  Defendant argues that plaintiffs' claim that there is or might be access by vehicle to Cayuga Lake via the easement is "absurd" as there is a 4-5 foot drop-off from the upland property.

"[W]here an easement is created by express grant and its sole purpose is to provide ingress and egress, but it is not specifically defined or bounded, 'the rule of construction is that the reservation refers to such right of way as is necessary and convenient for the purpose for which it was created' ". *J.C. Tarr, Q.P.R.T. v. Delsener*, 19 A.D.3d 548, 551 (2d Dep't 2005). The actual use defines the extent of the easement. *Lattimer v. Sokolowski*, 31 N.Y.S.2d 880, 882 (N.Y. Sup.1941) (holding that since the right-of-way reserved was not specifically defined, the reservation must be construed as referring to such a right-of-way as was reasonably necessary and convenient for the purpose for which it was created).

The terms of a grant are to be construed most strongly against the grantor in ascertaining the extent of an easement. *Ledley v. D.J. & N.A. Mgmt., Ltd.*, 228 A.D.2d 482 (2d Dep't 1996). The extent and nature of an easement must be determined by the language contained in the grant, aided where necessary by any circumstances tending to manifest the intent of the parties' ". *Raven Indus., Inc. v. Irvine*, 40 A.D.3d 1241, 1242 (2007) (quoting *Hopper v. Friery*, 260 A.D.2d 964, 966 (3d Dep't 1999)); *see also Grand Cent. Plaza, Inc. v. Bussel*, 140 A.D.2d 907, 909 (3d Dep't 1988) (holding that where an express easement is created, but the language creating it is ambiguous concerning the nature and extent of the easement, resort to the parties' intention is appropriate to aid in construction). A court may ascertain intent by reference to "the conditions and purposes for which the easement was intended", or "the situation of the parties and the property, the circumstances at the time the instrument is executed, the practical construction as evidenced by the conduct and admissions of the parties themselves, and by the single 'contemporary usage with respect to the subject granted' ". *Grand Cent. Plaza, Inc.*, 140 A.D.2d at 909.

With regard to the location of an easement, where an easement in land is granted in

34

general terms, without giving definite location and description to it, so that the part of the land over which the right is to be exercised cannot be definitely ascertained, the grantor does not thereby acquire the use of the servient estate without limitation as to the place or mode in which the easement is to be enjoyed. *Fox v. Buffalo R. & P. Ry. Co.*, 67 Misc. 621 (N.Y. Sup. 1910). Similarly, when the express grant does not specify the width of the right-of-way, its width is construed to be that which is necessary for the use for which the right-of-way was created. *Oliphant v. McCarthy*, 208 A.D.2d 1079, 1080 (3d Dep't 1994) . Consequently, in this matter, plaintiffs do not maintain a right to pass over defendant's land at any place plaintiffs may select, but only the right to a reasonably convenient passageway. *See Peabody v. Chandler*, 42 A.D. 384 (3d Dep't 1899). The exercise of the right must be as little burdensome to defendant as possible. *Id*.

From the language of the Mandell and Fort deeds, the right to pass over the property conveyed, was for "teams" or "wagons" to Cayuga Lake. Plaintiffs argue that the easement for "teams" and "wagons" translates into motor vehicles and further claim that the requirement for vehicular crossings, did not "negate an ability to cross by foot anywhere". The Court has reviewed the record and finds that the evidence is not sufficiently developed to enable the Court to determine the nature, extent or location of plaintiffs' easement. In order to make a determination as to whether or not an easement is intended to include vehicular use, the claim must be supported by a fair interpretation of the evidence. *See generally Sundby v. Kay*, 2009 WL 1566697, at *1 (4th Dep't 2009). In this case, there is insufficient evidence before the Court to make such a determination. Specifically, there is no evidence in the record establishing that any portion of the land over defendant's 40-foot strip is suitable for vehicles. *Cf. Neuhaus*, 30 A.D.2d. at 826 (holding that the travel of automobiles over a right-of-way that had been

35

blacktopped was a continuation of the horse drawn wagons and Model T Fords that traversed the crossing in the past).  Indeed, plaintiffs' claims are belied by their own expert.   During Mr. Anderson's March 2008 inspection of the area, plaintiffs' expert found that the western border of defendant's property corresponded with a retaining wall approximately 5 feet tall and that the top of the wall was "more or less level with the railroad-strip land".  Moreover, plaintiffs have presented no evidence of any past vehicular use of the easement by plaintiff or any of plaintiffs' predecessors-in-interest.

In addition to the lack of evidence with regard to the nature of the easement, the Court is similarly constrained to determine the extent or location of the easement.  Indeed, the Court notes that although plaintiffs' expert, Mr. Nessell, opines that plaintiffs have a right of way that ran with the land, Mr. Nessell failed to provide any detail or specification regarding the location of such an easement or right-of-way.  As plaintiffs have failed to establish with competent, admissible evidence, where they seek to cross defendant's property, the Court is unable to determine the extent of the easement as a matter of law.

### c.    Was Easement Extinguished by Adverse Possession

Plaintiffs argue that their easements have not been extinguished by adverse possession.[18] The party seeking to extinguish an easement must establish that the use of the easement has been adverse to the owner of the easement, under a claim of right, open and notorious, exclusive and continuous for a period of 10 years.  *Spiegel v. Ferraro*, 73 N.Y.2d 622, 625 (1989).  Specifically, the party must show that she interfered with the easement owner's use and enjoyment of the easement for the requisite period of time.  *McGinley v. Postel*, 37 A.D.3d 783, 784 (2d Dep't

---

[18] Defendant has not addressed this issue.

2007) (holding that boulders and other obstructions did not prevent the plaintiff from

maneuvering around them and traversing the right of way); *see also Xeledon v. MacGillivray*, 263

A.D.2d 904 (3d Dep't 1999) (holding that the defendant's proof that he physically barred the

plaintiff from using or accessing boathouse and docks and regularly maintained the property to

the exclusion of all others for the requisite period of time was sufficient to establish the

extinguishment of the easement by adverse possession).

Upon a review of the record, the Court concludes that defendant has not demonstrated that

she interfered with plaintiffs use and enjoyment of the easement for the 10-year statutory period

sufficient to constitute an extinguishment of the easement by adverse possession.

### d.      Consummation Order

Defendant argues that pursuant to the Order, when title was passed to defendant, it passed

free and clear of all encumbrances including the covenants to maintain crossings and fencing

asserted by plaintiffs.[19]  Defendant further claims that as the Consummation Order was recorded,

plaintiffs are deemed to have knowledge of the Order and took title to their respective properties

with knowledge that any rights or claims to the disputed property were discharged in 1982.   In

further support of such notice, defendant argues that it is noted in the Abandonment Order that

Wells College, the previous owner of plaintiffs' properties, appeared before the ICC.

A bankruptcy sale that is "free and clear" of liens is only valid if all parties who have such

liens are served and have an opportunity to be heard.  *In re Oyster Bay Cove, Ltd.*,  196 B.R. 251,

254 (E.D.N.Y. 1996).  In the case of *In re Oyster Bay Cove*, the Court held:

> As the Bankruptcy Court correctly points out, a sale "free and clear of
> liens and other interests" has no impact on restrictions of record that

---

[19] Defendant has not cited to any caselaw in support of this contention.

> run with the land. "Free and clear" should be interpreted as speaking of interests against the property, such as liens or mortgages, which now attach to the proceeds of the sale. Therefore, the order to sell "free and clear" has no affect on the dedication of the road and the storm drain, which are easements that run with the land. Clearly, 11 U.S.C.A. § 363(f) FN7 and Bankruptcy Rule 6004, which refer to the sale of land "free and clear" from these "interests," are not intended to sever easements and other non-monetary property interests that are created by substantive State law. Indeed, absent the consent of the owner of the easement or the easement being in bona fide dispute, the Bankruptcy Code does not even allow the Bankruptcy Court to authorize a sale of the property "free and clear" of an easement.

*Id*. at 255. "[A]bsent the consent of the owner of the easement or the easement being in bona fide dispute, the Bankruptcy Code does not even allow the Bankruptcy Court to authorize a sale of the property 'free and clear' of an easement." *City of New York v. Nat'l R.R. Passenger Corp.*, 2008 WL 5169636, at *8 (E.D.N.Y. 2008) (citing *In re Oyster Bay Cove*, 196 B.R. at 255-56).

In the case at hand, the Consummation Order does not indicate that the railroad property is to be sold of free and clear of non-monetary restrictions of record that run with the land. *See Id.* Further, the deed conveying the 40-foot strip to defendant specifically provides, "subject to . . . visible easements and easements and restrictions of record". With regard to notice, the Court notes that although the Abandonment Order makes reference to Wells College, the Order indicates that the Commission considered the protest of, "the President of Wells College that the right-of-way of the line to be abandoned be disposed of by the applicant in a manner not adverse to the environmental interests of the residents in the area". The Order lacks any reference to easements or rights-of-way as the same pertain to Wells College's property. Accordingly, the Court finds defendant's argument to be without merit.

To summarize, the Court finds that there are issues that may only be resolved by the finder of fact including: (1) the precise extent and nature of the easement by foot; (2) whether or not

38

plaintiffs' easement includes the use of vehicular traffic; and if so, (3) the nature and extent of such vehicular easement.  *See Rose v. La Joux*, 93 A.D.2d 817 (2d Dep't 1983) (holding that disputes as to the exact nature of the easement precluded summary judgment).  Accordingly, summary judgment is denied.

### D.      Plaintiffs' Riparian Rights

As an alternative argument, plaintiffs claim that regardless of whether or not plaintiffs own the land west of the 40-foot strip and regardless of whether or not plaintiffs' have an easement to cross defendant's property, plaintiffs' predecessors-in-interest retained their riparian rights to the shore of Cayuga Lake which now belong to plaintiffs.[20]   As the Court has determined that plaintiffs own the disputed land and further, that plaintiffs' have an easement to cross defendant's property, plaintiffs' argument is moot

### E.      Plaintiffs' Motion for Permanent Injunction

Plaintiffs move for a permanent injunction enjoining defendant from erecting any fence, or in the alternative, permitting defendant to erect only 30 feet of fencing on the southern portion of the Koepp/Place property and no fencing on the Zwigard property.

At the time of removal to the district court, a temporary restraining order was in effect.  The order, signed by Judge Leone, was issued pending a hearing for a preliminary injunction.[21]  On February 5, 2009, a Pre-Motion Conference was held before this Court during which the parties agreed that Judge Leone's Order would stay in place pending the outcome of the motions for summary judgment.  Plaintiffs now move for a permanent injunction.  However, as the Court

---

[20] Defendant does not respond to this argument as plaintiffs first raised this contention in Plaintiffs' Reply Memorandum of Law.

[21] The state court hearing was not held as the case was removed to this Court.

39

cannot determine, as a matter of law, the nature, extent or location of plaintiffs' easement, plaintiffs' motion to permanently enjoin defendant from erecting a fence is denied at this time. While a permanent injunction is not the appropriate remedy, the Court recognizes that plaintiffs are entitled to some injunctive relief.  In that regard, as the temporary restraining order cannot be extended indefinitely, *see Bonechi v. Irving Weisdorf & Co., Ltd.*, 1995 WL 731633, at *4 (S.D.N.Y. 1995); *see also Pan Am. World Airways, Inc. v. Flight Engrs' Int'l Assn*., 306 F.2d 840, 842 (2d Cir. 1962) (holding that the fact that notice is given and a hearing held cannot serve to extend a temporary restraining order indefinitely beyond the period limited by Rule 65),  the Court will address the issue of whether or not plaintiffs are entitled to a preliminary injunction. *See Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007) (district court appropriately consolidated the plaintiff's request for a permanent injunction with his request for a preliminary injunction) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n. 12 (1987)) (holding that the standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success).

In order for plaintiffs to obtain a preliminary injunction, they must demonstrate: (1) that they will be irreparably harmed in the absence of an injunction; and (2) either (a) a likelihood of success on the merits; or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in their favor.  *Buck v. Libous*, 2005 WL 1460408, at *9 (N.D.N.Y. 2005) (citing *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir.1999)).  "The purpose of a preliminary injunction is to preserve the status quo between parties pending a final determination of the merits."  *Casanova Entm't Inc. v. City of New Rochelle*, 375 F.Supp.2d 321, 333 (S.D.N.Y. 2005) (citing *Alliance*

*Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688, 692 (2d Cir. 1998)).

For the reasons stated above, the Court finds that plaintiffs are entitled to a preliminary injunction.  Accordingly, defendant is enjoined and restrained during the pendency of this action from erecting or constructing any fencing along the property line separating plaintiffs' property and the 40-foot strip which would interfere with plaintiffs' easement.

**V.      CONCLUSION**

It is therefore

**ORDERED** that plaintiffs' motion for summary judgment (Dkt. No. 19) declaring that plaintiffs own the property, if any, to the west of defendant's 40-foot strip is **GRANTED**, and it is further

**ORDERED** that plaintiffs' motion for summary judgment (Dkt. No. 19) declaring that plaintiffs have rights-of-ways for crossing by foot across the entire length of defendant's 40-foot strip is **DENIED**, and it is further

**ORDERED** that plaintiffs' motion for summary judgment (Dkt. No. 19) declaring that plaintiffs have three vehicular rights-of-ways across defendant's 40-foot strip is **DENIED**, and it is further

**ORDERED** that plaintiffs' motion for summary judgment and dismissal of defendant's affirmative defenses and counterclaims (Dkt. No. 19) is **DENIED**, and it is further

**ORDERED** that defendant's cross motion for summary judgment (Dkt. No. 23) declaring that defendant holds a fee interest in the Former Rail Road Property is **GRANTED**, and it is further

**ORDERED** that defendant's cross motion for summary judgment (Dkt. No. 23) for a determination that ownership in any land west of the 40-foot strip is vested with defendant is

**DENIED**, and it is further

ORDERED that defendant's cross motion for summary judgment (Dkt. No. 23) for a determination that plaintiffs do not have any easement to cross defendant's property is **DENIED**, and it is further

ORDERED that defendant is enjoined from erecting, installing or constructing any fencing along the property line separating plaintiffs' property and the 40-foot strip which would interfere with plaintiffs' easement during the pendency of this action, and it is further

ORDERED that the case is scheduled for a settlement conference before the undersigned on March 9, 2010, at 10:00 a.m.  In the event that the matter does not resolve on March 9th, the matter will be referred to the Magistrate to hold a Rule 16 Conference.

**IT IS SO ORDERED.**

Date:   February 4, 2010

Norman A. Mordue
Chief United States District Court Judge

42